**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| MURATA MANUFACTURING CO., LTD., ) | |
| ) | |
| Plaintiff, ) | No. 03 C 2934 |
| ) | |
| vs. ) | Judge Joan Gottschall |
| ) | |
| BEL FUSE, INC., *et al.*, ) | |
| ) | Magistrate Judge Jeffrey Cole |
| Defendants. ) | |
| ) | |

## MEMORANDUM OPINION AND ORDER

Murata Manufacturing Co., Ltd. ("Murata") sued Bel Fuse Inc., Bel Fuse Ltd., Bel Stewart Ltd., and Bell Connector Inc. (collectively "Bel Fuse") for infringement of United States Patent No. 5,069,641 ("the '641 Patent"). In response, Bel Fuse has interposed the defense that the '641 Patent is invalid as a result of inequitable conduct before the Patent and Trademark Office. Among the bases of this defense, are Bel Fuse's claims that the inventors of the patent-in-suit intentionally withheld a prior art patent that was material to the examination of the patent-in-suit. As part of its discovery to support this defense, Bel Fuse seeks to depose one of the inventors, Yukio Sakamoto, a Japanese citizen and former employee of Murata.

Murata has informed Bel Fuse that it cannot produce Mr. Sakamoto for the very reason that he is a former employee and no longer under Murata's control. It also argues that Bel Fuse's motion is untimely. Bel Fuse contends that Mr. Sakamoto is a "managing agent" of Murata and therefore subject to notice under Fed.R.Civ.P. 30(b)(1), and that the agreement under which Mr. Sakamoto assigned the patent-in-suit to Murata, requires him to appear at a deposition in the United States. As for the timeliness of its motion, Bel Fuse maintains that it has been "extremely diligent in its

attempts to compel Mr. Sakamoto to appear for a deposition voluntarily." (*Bel Fuse's Reply*, at 4).

## I.

## BACKGROUND

Bel Fuse has been after Mr. Sakamoto for quite some time. It first noticed his deposition on January 22, 2004. (*Appendix to Bel Fuse's Brief*, Ex. 6). At that time, Bel Fuse already knew from Murata's initial disclosures that Mr. Sakamoto was not longer in Murata's employ. (*Appendix to Bel Fuse's Brief*, Ex. 4, ¶ A3). Murata was under no obligation to produce him, but did provide Bel Fuse with Mr. Sakamoto's last known address on March 2, 2004. (*Murata's Opposition*, Ex. 1). Shortly thereafter, however, Bel Fuse postponed its plan to depose Mr. Sakamoto. As counsel would later explain, Bel Fuse determined it would make more sense to depose the inventors after the court construed the disputed terms of the '641 Patent's claims, especially given the fact that when Bel Fuse attempted to depose one of the other inventors, Murata interposed frequent objections regarding use of claims term that had not yet been construed. (8/23/06 Transcript (Tr.), at 6).

On July 28, 2006, Judge Gottschall issued a Memorandum Opinion and Order construing the disputed terms in the claims of the '641 Patent. (Dkt. # 245-46).[1] The parties appeared before me about a month later, on August 23rd, seeking a deadline for the close of discovery. Bel Fuse sought to put off the close of discovery a bit longer than Murata would have liked because, again, Bel Fuse had postponed deposing the Japanese inventors of the '641 Patent while the claim construction was pending. The parties offered their proposed cut-off dates: Murata asking for January 1, 2007; Bel

---

[1] For whatever reason – hopefully not to shed a better light on its efforts through mischaracterization of the record – Bel Fuse states that Judge Gottschall did not issue her opinion until August 23, 2006. (*Bel Fuse's Reply*, at 4). But the opinion was dated July 28th, and the docket reflects that it was entered on July 31st.

Fuse requesting April 20, 2007. With the logistical difficulties of deposing the Japanese inventors in mind[2], I granted the defendants the time they wanted, but cautioned that there would be no extensions regardless of whether there were logistical difficulties in setting up the depositions in Japan since this was an issue that was long known to everyone. (8/23/06 Tr., at 13,14). As it turns out, there were difficulties, but it was not until February 22, 2007, that the parties returned to address those and other discovery problems.

In the interim, Bel Fuse renewed its quest to depose Mr. Sakamoto. About a month after Judge Gottschall entered her *Markman* decision – but just two days after I adopted Bel Fuse's proposed April 20th discovery deadline[3] – Bel Fuse contacted a Japanese attorney, Minoru Senda, by email on August 25, 2006, asking him to act on Bel Fuse's behalf and help arrange Mr. Sakamoto's deposition in Japan, sometime prior to April 20, 2007. (*Bel Fuse's Reply*, Ex. A, at 5-6). Mr. Senda responded on August 31, 2006, indicating that he would see what he could do, and get back to Bel Fuse "in a month or so." (*Id.*, Ex. A, at 4). This alarmed Bel Fuse, which replied the very next day – September 1st – to inform Mr. Senda that the matter was "somewhat time sensitive"

---

[2] Japan is not a party to the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters. Japanese law authorizes a deposition in Japan for use in United States courts only if (1) the witness or party is willing to be deposed, (2) the deposition takes place on United States consular premises, (3) a consular officer presides over that deposition, pursuant either to a letter rogatory issued by a United States court or to a court order that specifically authorizes a U.S. consular officer to take the deposition on notice, and each participant traveling from the United States to Japan to participate in the deposition obtains a "deposition visa." *See* Consular Convention and Protocol, Mar. 22, 1963, U.S.-Japan, art. 17(1)(e)(ii), 15 U.S.T. 768; Fed.R.Civ.P. 28(b); 22 C.F.R. §§ 92.49-92.71; *In re Application for Order Quashing Deposition Subpoenas, dated July 16, 2002*; 2002 WL 1870084, *5 (S.D.N.Y. 2002). Then, the matter of scheduling becomes the problem, and it is not an insignificant hurdle. *See In re Vitamin Antitrust Litigation*, 2001 WL 358 14436, *6 (D.D.C. 2001).

[3] Bel Fuse was either confident or merely unconcerned in waiting to set in motion attempts to locate Mr. Sakamoto until after I set the discovery deadline. For all Bel Fuse knew, it might have been Murata's proposal that was adopted, which would have given Bel Fuse just over four months to arrange the deposition.

since there was a six-month wait to take depositions of the sort at issue at the United States Consulate in Japan. (*Id.*).

Then, on September 19th, Bel Fuse sent Mr. Senda another email, that included a somewhat curious chronology:

> . . . Please let us know if you have made an[sic] progress in contacting any of the potential witnesses. Since my last email, the judge has set a deadline to complete discovery of April 20, 2007. We therefore would like to move ahead with the depositions as soon as we can. . . .

(*Id.*, Ex. A, at 3). Obviously, Bel Fuse had known of the deadline since August 23rd and had told Mr. Senda of it in its initial email.

There was also a problem with Mr. Sakamoto's whereabouts. Bel Fuse unintentionally sabotaged Mr. Senda's efforts by failing to provide him with Mr. Sakamoto's address which, as already noted, Murata had given Bel Fuse early on, in March of 2004. (*Murata's Opposition*, Ex. 1). The address Bel Fuse gave Mr. Senda happened to be Murata's corporate headquarters (*Bel Fuse's Reply*, Ex. A, at 2, 24), and not the address Murata had given Bel Fuse for Mr. Sakamoto. When Mr. Senda indicated that he was trying to contact Mr. Sakamoto through the Murata corporate address, Bel Fuse cautioned Mr. Senda not to do so, explaining that it was "concerned that Murata might thwart [its] efforts to reach [Mr. Sakamoto] so that contacting [him] through Murata might prove difficult." (*Bel Fuse's Reply*, Ex. A, at 3). Bel Fuse contacted Murata for Mr. Sakamoto's address again, and finally provided Mr. Senda with it on September 27, 2006. (*Id.*, Ex. A, at 1). Bel Fuse had no further contact with Mr. Senda, and "later learned of his unfortunate death in mid November." (*Bel Fuse's Reply*, at 4).

In addition to its efforts through Mr. Senda, Bel Fuse also sought to reach Mr. Sakamoto

4

through Murata. On September 1, 2006, it informed Murata that it was in the process of contacting Mr. Sakamoto to see if he was willing to appear for a deposition and would appreciate any help Murata could provide. (*Supplemental Memorandum*, Ex. 13). Murata wrote back, reminding Bel Fuse that it had already provided it with Mr. Sakamoto's last know address and asked that Bel Fuse not insinuate that it was a neutral party when it contacted the inventors, and not attempt to induce them to breach obligations of confidentiality they owed Murata. (*Supplemental Memorandum*, Ex. 14). Murata also called the deposition a "waste of time and money." (*Id.*). On September 19, 2006, Bel Fuse replied, expressing disappointment that Murata had declined to offer any meaningful assistance. (*Id.*, Ex. 15).

With no help from Murata, and not having heard from Mr. Senda for a few months, Bel Fuse set off on another tack on January 3, 2007. Obviously, the combination of the April 20th discovery deadline and the six-month wait for United States Consulate facilities made efforts at that late date almost futile. Nevertheless, Bel Fuse contacted Craig Bachman, an American attorney experienced in obtaining evidence in Japan, and another Japanese attorney, Somuku Iimura. The idea was to see if Mr. Sakamoto might voluntarily appear for a deposition in Hawaii, thereby eliminating the scheduling difficulties with the Consulate. (*Bel Fuse's Reply*, Ex. B, at 17). By January 12, 2007, however, the two attorneys had still not even been able to find Mr. Sakamoto's telephone number. (*Id.*, Ex. B, at 6, 8). On January 19th, they attempted to contact him by mail. (*Id.*, at 7). Mr. Sakamoto responded by letter on February 4, 2007, refusing to accept Bel Fuse's request to be deposed, because he had been retired for a while and no longer had any relevant documents or materials. (*Id.*, at 1).

On January 27, 2007, while awaiting what would be Mr. Sakamoto's negative response, Bel

Fuse issued a notice for his deposition to Murata, despite the fact that Bel Fuse knew that Mr. Sakamoto had not been a Murata employee for years. (*Appendix to Bel Fuse's Brief*, Ex. 7). After Murata reminded Bel Fuse of this, Bel Fuse responded in writing on February 1, 2007, with a new theory. According to Bel Fuse, Murata was obligated to produce Mr. Sakamoto because when he assigned his patent to Murata, he agreed to assist Murata in the enforcement of the patent. (*Id.*, Ex. 10). Not only that, but Bel Fuse contended that the deposition must be in Chicago. (*Id.*, Ex. 10). The patent assignment upon which Bel Fuse now relied had been produced early in discovery. On February 15th, Murata wrote back expressing its disagreement with Bel Fuse's interpretation of the patent assignment and of the applicable case law. (*Id.*, Ex. 9).

As already noted, the parties were back before me on February 22nd, and Bel Fuse brought its problems with Mr. Sakamoto to my attention and explained its new theory. It also added that it felt Murata could compel Mr. Sakamoto to be deposed because he was a "managing agent" of Murata. (2/23/07 Tr., at 63). The parties set forth their positions regarding the language of the patent assignment, and I conveyed my first impression that the language appeared sufficiently broad to give Murata the power to require Mr. Sakamoto to submit to a deposition. (*Id.*, at 67-68, 74, 76). In the end, however, the parties advised me that they would attempt to work the problem out themselves. (*Id.*, at 65, 77-79). Murata indicated that discussions had already touched on whether the parties might simply stipulate that neither side would employ Mr. Sakamoto's testimony. (*Id.*, at 65; *Appendix to Bel Fuse's Brief*, Ex. 12). But the parties failed to work things out, and Bel Fuse filed its motion to compel on March 1, 2007.

6

## II.
## DISCUSSION

### A.
### Bel Fuse Did Not Violate The Local Rules

As a preliminary matter, Murata argues that Bel Fuse's motion must be denied because Bel Fuse failed to comply with Local Rule 37.2. Murata's Local Rule 37.2 argument may be quickly disposed of. The rule requires a motion for discovery to:

> include[] a statement (1) that after consultation in person or by telephone and good faith attempts to resolve differences they are unable to reach an accord, or (2) counsel's attempts to engage in such consultation were unsuccessful due to no fault of counsel's.

L.R. 37.2. In paragraph six of its motion, Bel Fuse included just such a statement. Even if Murata were correct that the parties have conferred regarding the matter of Mr. Sakamoto's deposition, Bel Fuse has only now raised the issue of whether Mr. Sakamoto qualifies as a "managing agent," it is obvious that further discussions would be pointless.

The Seventh Circuit has recently stressed the importance of compliance with Local Rules. *See FTC v. Bay Area Business Council, Inc.,* 423 F.3d 627 (7th Cir.2005). But Local Rules have their limitations, and like all rules, they must have sufficient flexibility and must be applied to accomplish the ends of justice and "not bury it beneath the pressure of their own weight." Joseph Story, Miscellaneous Writings, 210 (1852). For that reason, courts have broad discretion to determine how and when to enforce local rules, *Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 923 (7th Cir.1994), and they have the inherent authority to decide when a departure from their Local Rules should be excused. *Somlyo v. J. Lu-Rob Enterprises,* 932 F.2d 1043, 1048 (2nd Cir.1991). *Cf. Brengettcy v. Horton,* 423 F.3d 674 (7th Cir.2005)("noncompliance with a court's local rules does

not create a jurisdictional bar for the district court or for us."). An appropriate circumstance for excusing non-compliance with rules is when compliance would have been an exercise in otiosity. The doctrine of futility is as applicable in the context of Rule 37 and Local Rule 37.2 as it is in any other. *See Armstrong v. Amstead Industries, Inc.*, No. 01 C 2963, 2004 WL 1497779, *3 (N.D.Ill. July 2, 2004)(Moran, J.)(accepting plaintiffs' contention that a meeting between the parties would have been fruitless); *Royal Maccabees Life Insurance Co. v. Malachinski*, No. 96 C 6135, 2001 WL 290308, *18 (N.D.Ill. Mar. 20, 2001) (Guzman, J.)("Taking into account defendant's prior conduct we find that plaintiff adequately complied with Rule 37's certification requirement and Local Rule 37.2."); *Fidelity Nat. Title Insurance. Co. of New York*, 2002 WL 1433584, *3 (N.D.Ill.2002)(Conlon, J.)(noting failure to explain the manner in which further discussions between the parties would have promoted Local Rule 37.2's purpose).

In any event, Bel Fuse did raise its "managing agent" argument with Murata prior to filing the instant motion, at the February 23rd hearing.

## B.

## Bel Fuse's Motion Will Not Be Denied As Untimely

Murata also argues that Bel Fuse's motion must be denied as untimely. On August 23, 2006, Bel Fuse was given exactly the time it requested for discovery, and I adopted its proposed deadline of April 20, 2007. At that time, it had already been a month since Judge Gottschall issued her *Markman* ruling, but Bel Fuse had yet to take any action regarding Mr. Sakamoto's deposition. Bel Fuse had an eight-month window in which to locate Mr. Sakamoto in Japan, and arrange for his deposition – a process that Bel Fuse has acknowledge could take six months in the best of circumstances. And yet, as it pursued Mr. Sakamoto, Bel Fuse mistakenly employed the wrong

8

address, and its Japanese attorney passed away. After losing contact with that gentleman for just over three months, Bel Fuse engaged two additional attorneys just after the first of the year. By that time, Bel Fuse realized that a deposition at the United States Consulate was becoming a logistic impossibility, and it was hoped that Mr. Sakamoto could be enticed into traveling to Hawaii or elsewhere in the United States.

While hope may spring eternal, reality cannot be ignored, and there was nothing to lead Bel Fuse to the conclusion that Mr. Sakamoto would ever leave Japan. Bel Fuse attempted once again to notice his deposition through Murata. But, when he was finally contacted at the beginning of February, Mr. Sakamoto refused, and Murata once again reminded Bel Fuse that it had no control over Mr. Sakamoto.

The parties debated Bel Fuse's theories regarding the patent assignment language and whether Mr. Sakamoto could be considered a managing agent, and discussed the matter in court. There was one last attempt to work out some sort of stipulation regarding the non-employment of Mr. Sakamoto as a witness, but these efforts failed. It was not until March 1, 2007, that Bel Fuse filed its motion to compel, which was not fully briefed until March 30th, just three weeks before discovery was set to close.

Bel Fuse calls its performance "extremely diligent," but that assessment is less than accurate. It waited a month after the claims construction opinion before attempting to locate Mr. Sakamoto. It did suffer some unfortunate setbacks along the way, but apparently, while pursuing Mr. Sakamoto, it did not bother to arrange for consulate facilities in the event it was successful, despite the six-month waiting period. Although it was aware of the patent assignment early in this litigation and could have raised both it and its "managing agent" argument at any time, it chose not do so.

9

Although it is a closer question than Bel Fuse would acknowledge, it cannot be said that the motion should be denied as untimely. The Federal Rules of Civil Procedure place no prescribed time limit on the outside date for filing a motion to compel discovery. In one regard, however, a line of sorts has been sketched by a series of decisions: motions to compel filed after the close of discovery are almost always deemed untimely. *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 647 (7th Cir.2001).[4] Greater uncertainty occurs where the motion is made very close to the discovery cut-off date. Some districts by local rule have imposed time limits within which motions to compel must be brought. *See, e.g. United States ex. rel. Becker v. Westinghouse Savannah River Co.*, 305 F.3d 284, 290 (4th Cir.2002)(Local Rule 37.01 of the District of South Carolina requires that motions to compel must be filed within 20 days after receipt of the discovery response); *Sonnino v. University Kansas Hospital Authority*, 220 F.R.D. 633, 636 (D.Kan.2004)(Local 333 Rule 37.1(b) of the District of Kansas requires that the motion to compel be filed within 30 days after receipt of the discovery response). Most, however, have no such rules, and the matter is left to the broad discretion possessed by the district courts to control discovery.

How is that discretion to be exercised? Is a motion to compel filed four days before the close of discovery too late? At least one court has said it is. *Ridge Chrysler Jeep, LLC v. Daimler Chrysler Services North America, LLC*, 2004 WL 3021842 (N.D.Ill.2004). What if the motion had been made six or perhaps twelve days before the close of discovery? Would the result have been different? Is

---

[4] But even here the line meanders, and motions made after the close of discovery are not inevitably out-of-bounds. *See e.g., Blanchard v. EdgeMark Financial Corp.*, 192 F.R.D. 233, 235 (N.D.Ill.2000) (30 days not too late); *Gault v. Nabisco Biscuit Co.*, 184 F.R.D. 620, 622 (D.Nev.1999); *Shamis v. Ambassador Factors Corp.*, 34 F.Supp.2d 879 (S.D.N.Y.1999)(No unreasonable delay where motion to compel was filed four days after the close of discovery).

a week the proper cut-off point, or perhaps two weeks? Or, as here, several weeks before the cutoff, but with the opportunity for completion rather remote? To pose the question is to demonstrate that there is no principled or mathematical way of determining in advance in every case when a motion to compel should be deemed untimely based upon an arbitrarily prescribed number. As Justice Cardozo said in another context, "[w]here the line is to be drawn between the important and the trivial cannot be settled by a formula." *Jacob & Youngs, Inc. v. Kent,* 230 N.Y. 239, 243, 129 N.E. 889 (1921). *Compare, Louisville Gas & Electric v. Coleman,* 277 U.S. 32, 41, 48 S.Ct. 423, 72 L.Ed. 770 (1928)(Holmes, J., dissenting). The answer then must necessarily be found in the entire complex of circumstances that gave rise to the motion, and what is untimely in one case may not be in another.

Here, the motion was filed seven weeks before the discovery deadline. Bel Fuse might have supposed that if it prevailed on all points and Murata is ordered to produce Mr. Sakamoto in Chicago or elsewhere in the United States, it could be done exceedingly quickly. But Mr. Sakamoto has already proven difficult to contact – he may not even have a telephone. Indeed, as Murata points out, he also may not have a passport, and there is no telling how long the process of obtaining one might take. As I pointed out at the August 23rd hearing, the logistics were bound to be difficult, but it was an issue Bel Fuse knew about for a long time. By waiting until, if not the eleventh hour, than the ninth or tenth, Bel Fuse might have sabotaged any chance it might have had to depose Mr. Sakamoto. The motion will not be denied as untimely, but Bel Fuse's untimeliness and delay may have undesired and adverse consequences. *See* discussion in *Holiday v. City of Chicago,* 2006 WL 2868910 at *2 (N.D.Ill. 2006)(collecting cases).

C.

## Mr. Sakamoto Cannot Be Deposed As Murata's Managing Agent

Bel Fuse contends that Murata is required to produce Mr. Sakamoto for a deposition pursuant to Bel Fuse's Rule 30(b)(1) notice because he is Murata's "managing agent." Obviously, the assertion that one of Murata's long-retired inventors is for present purposes Murata's "managing agent" appears to be a stretch from the from the very first glance. As courts have interpreted the term, it is generally found to include present employees, and even then, only employees with control or authority over day-to-day business decisions of the corporation. *JSC Foreign Economic Ass'n Technostroyexport v. International Development and Trade Services, Inc.*, 220 F.R.D. 235, 238 (S.D.N.Y. 2004); *E.E.O.C. v. Honda of America Mfg., Inc.*, 2007 WL 682088, *2 (S.D.Ohio 2007). But Bel Fuse informs that courts have sometimes held that corporate parties must produce individuals pursuant to Rule 30, even though those individuals had no formal affiliation or position with the corporations at the time their depositions were noticed. The cases Bel Fuse relies upon, however, do not require a similar conclusion in this case.

To determine whether an individual is a managing agent, courts look to several factors: (1) whether he has general powers allowing him to exercise judgment and discretion in corporate matters; (2) whether he can be relied on to testify, at the corporation's request, in response to the discovery proponent's demands; (3) whether there are any other employees who have more authority than the individual in regard to information concerning the subject matter at issue in the case; (4) his general responsibilities respecting the matters involved in this litigation; and (5) whether he can be expected to identify with the interests of the corporation. *Richard Wolf Medical Instruments Corp. v. Dory*, 1989 WL 51127, *1 (N.D.Ill. 1989). And it is Bel Fuse's burden to establish the Mr.

12

Sakamoto is a "managing agent." *Id.; Yaskawa Elec. Corp. v. Kollmorgen Corp.*, 201 F.R.D. 443, 444 (N.D.Ill. 2001); *JSC Foreign Economic Ass'n*, 220 F.R.D. at 238. No single factor appears to be dispositive, although, as will become clear, courts have focused on the degree of control the individual has over the corporation's affairs, or at least over those affairs at issue in the case.

It is rare that a former corporate officer will be considered a managing agent and unheard of that a former employer who never exercised such authority qualifies as a managing agent. That is the category in which Mr. Sakamoto must be placed. As to the subject matter of this case, he was just one of three inventors of the patent-in-suit. The one inventor still in Murata's employ has been deposed, as has the Murata employee responsible for the patent prosecution. There is nothing other than speculation to suggest that Mr. Sakamoto identifies with Murata's interests. He has already declined to testify in this matter, although, as will be discussed later, he does have an agreement with Murata regarding his participation in proceeding connected with the patent-in-suit. But that is just one factor, and a review of the cases on which Bel Fuse relies leads inexorably to the conclusion that Bel Fuse has failed to meet its burden of demonstrating Mr. Sakamoto is Murata's managing agent.

The principal case Bel Fuse cites, *Dubai Islamic Bank v. Citibank, N.A.*, 2002 WL 1159699 (S.D.N.Y. 2002), dealt with the defendant's motion to depose ten men, all of whom were *still in the plaintiff's employ*. Even so, the court determined that some were not subject to deposition by notice. Nearly all were formerly in positions of high authority with the defendant, although most had been demoted as a result of fraud charges. 2002 WL 1159699 , *5-11. In determining whether they qualified as managing agents for the purpose of depositions, the court focused on whether the potential deponents held "clear position[] of authority," 2002 WL 1159699, *5-6, 11; or exercised "independent discretion" over corporate matters, 2002 WL 1159699, *6, 8, or held "high-ranking"

13

or "high-level" status, 2002 WL 1159699, *7, 10. There is nothing to suggest that Mr. Sakamoto, who is retired, ever held such a position with Murata. His situation could not be more dissimilar from that of the individuals in *Dubai Islamic Bank*.

Bel Fuse also points to *Independent Productions Corp. v. Loew's, Inc.*, 24 F.R.D. 19, 26 (S.D.N.Y. 1959), which it characterizes as holding that two former employees of the plaintiff were subject to deposition notices. Actually, the ruling denied the plaintiff's motion for an order barring the defendant from deposing the two employees and has no application to the facts of this dispute. Unlike Mr. Sakamoto, both employees in *Independent Prods.* were, before their resignations, actually corporate officers: president and secretary-treasurer. Also unlike Mr. Sakamoto, they resigned their positions for the very purpose of avoiding depositions. *Id.* at 22-23. Furthermore, in determining whether they were managing agents, the court made a distinction between that capacity and one of an ordinary employee, insofar as a managing agent was "'invested by the corporation with general powers to use his judgment and discretion in dealing with corporate matters.'" *Id.* at 25. Clearly, that is not the case with Mr. Sakamoto. Finally, the court also found that the two employees continued to participate in the management of the plaintiff corporation even after their resignations. *Id.* at 26. Here, there is nothing to suggest that Mr. Sakamoto even maintains any contact with Murata.

Other cases Bel Fuse cites are even farther off the mark, involving current employees with on-going management responsibilities. *See In re Meta Systems*, 1997 WL 173206, *2 (Fed. Cir. 1997)(unpublished order); *Malletier v. Dooney & Bourke, Inc.*, 2006 WL 3476735, *15 (S.D.N.Y.) (S.D.N.Y. 2006)(deposition of Italian employee in Italy where evidence showed his position involved judgment and discretion in handling corporate matters). Only one case even marginally

14

appears to support its managing agent theory: *Alcan Intern. Ltd. v. S.A. Day Mfg. Co., Inc.*, 176 F.R.D. 75 (W.D.N.Y. 1996). There the court held that plaintiff had to produce a retired employee who was a German citizen for a deposition. The opinion, however, gives no insight into the retired employee's responsibilities, when he was employed, or how these responsibilities might have qualified him as a "managing agent." Instead, the opinion seems to focus instead on the fact the he had direct knowledge about the subject matter at issue. *Id.* at 79. But that is plainly not the test. Also, the decision relies on *Kolb v. A.H. Bull Steamship Co.*, 31 F.R.D. 252 (E.D.N.Y.1962), where the court ordered the third-party defendant to produce its currently-employed, managing agent – that was his title – who oversaw the construction of the collapsed bridge that gave rise to the case. If the *Alcan* court's citation to *Kolb* is an indication of the German employee's authority, then it exceeds that of Mr. Sakamoto, even while he was employed. But because *Alcan* provides no discussion as to the retired German employee's responsibilities, it is "weak authority" for Bel Fuse's position. *Szmaj v. American Tel. & Tel. Co.*, 291 F.3d 955, 956 (7th Cir. 2002)(Posner, J.)..

Bel Fuse, however, employs *Alcan* to focus on the fact that Mr. Sakamoto, like the retired employee in *Alcan* has knowledge about the subject matter of the case. Even the principal case Bel Fuse relies upon, however, is rather explicit that this is not the test for managing agent. *Dubai Islamic Bank*, 2002 WL 1159699, *6, *8. Accordingly, I cannot conclude that Bel Fuse has met its burden of establishing that Mr. Sakamoto, retired inventor, is subject to notice for deposition as Murata's managing agent. But Mr. Sakamoto did execute an assignment of his rights to the patent-in-suit to Murata that includes language regarding his obligations to participate in certain proceedings upon Murata's request. Resolution of this discovery dispute turns on the interpretation of that document.

15

## D.

### Murata Must Request That Mr. Sakamoto Testify Under The Patent Assignment

When Mr. Sakamoto and his two colleagues assigned Murata the rights to the '641 Patent, they signed an agreement that provided that they "covenant[ed] and agree[d] . . . with [Murata and] . . . its legal representatives . . . that . . . [he] w[ould], whenever counsel of [Murata] . . . shall advise that . . . any proceeding in connection with [the '641 Patent] in any country . . . is lawful and desirable . . . take all lawful oaths, and do all acts necessary or required to be done for the . . . enforcement and defense of [the '641 Patent] . . . at the cost and expense of [Murata]." (*Appendix to Bel Fuse's Brief*, Ex. 5). [5]

As I tentatively suggested at the February 23rd hearing when the document was first shown to me, the breadth of the agreement encompassing as it did, "*any* proceeding in *any* country" and "*all* lawful oaths, and *all* acts necessary" to enforce or defend the '641 Patent, would seem to include testimony at a deposition. Ignoring the provision that seems to repose in Murata the discretion to

---

[5] The agreement in pertinent part provided:

AND for the same consideration, the said assignors hereby covenant and agree to and with the said assignee, its successors, legal representatives and assigns, that the said assignors will, whenever counsel of the said assignee, or the counsel of its successors, legal representatives and assigns, shall advise that any proceeding in connection with said inventions, or said application for Letters Patent, or any proceeding in connection with Letters Patent for said inventions in any country, including interference proceedings, is lawful and desirable, or that any division, continuation or continuation-in-part of any application for Letters Patent, or any reissue or extension of any Letters Patent, to be obtained thereon, is lawful and desirable, sign all papers and documents, take all lawful oaths, and do all acts necessary or required to be done for the procurement, maintenance, enforcement and defense of Letters Patent for said inventions, without charge to said assignee, its successors, legal representatives and assigns, but at the cost and expense of the said assignee its successors, legal representatives and assigns.

(*Appendix to Bel Fuse's Brief*, Ex. 5).

determine whether seeking Mr. Sakamoto's assistance is "desirable," Bel Fuse argues that this means that Murata must produce Mr. Sakamoto for a deposition *and* that it must produce him in Chicago or at least in the United States. Murata contends that the only activities contemplated by the language are certain proceedings before the Patent Office involving the filing of sworn statements.

Other courts have dealt with similar, although not identical, language in patent assignments. Often, the document will include a specific agreement to *testify* in a legal proceeding. *Medpointe Healthcare, Inc. v. Apotex, Inc.*, 2007 WL 211202, *1 (D.Del. 2007)(". . . and testify in any legal proceedings...."); *Minebea Co., Ltd. v. Papst*, 370 F.Supp.2d 302, 309 (D.D.C. 2005)(". . . covenant and agree [to] . . . testify in any legal proceeding . . ."); *In re Nifedipine Capsule Patent Litigation*, 13 U.S.P.Q.2d 1574 1989 WL 111112 (S.D.N.Y.1989)(". . . agree, whenever requested, to ... testify in *any* legal proceedings."). In those cases, courts have had no trouble finding that the assignee – here, Murata – must produce the inventor or assignor for deposition.

The language here, however, does not specifically say "testify," but instead requires Mr. Sakamoto to "take all lawful oaths, and do all acts necessary or required to be done for the . . . enforcement and defense of [the '641 Patent]" in "any proceeding." This is a good deal more specific than the general language in *Litetronics International, Inc. v. Technical Consumer Products, Inc.*, 2006 WL 2850513 (N.D.Ill. 2006) where the inventor agreed "generally to do everything possible to aid [plaintiff] . . . at their request and expense, in obtaining and enforcing patents for said invention in all countries." 2006 WL 2850513, *1. The court noted the provision of *In re Nifedipine* in which there was an agreement to testify whenever requested and found significant the absence of an "unequivocal[ ]" promise to testify and went on to say:

> On the information provided to the Court, the Court is not convinced that [plaintiff] had any meaningful contractual control over the inventors. For this reason, the Court

> denies [defendant's] motion for production of the inventor witnesses because there
> is no showing that either of the witnesses are under the actual control of [plaintiff],
> either because of an employment status or because of a contractual status.

2006 WL 2850513, *2 .

The court made no mention of "the information" the parties provided, or whether it was anything more than the language of the agreement. It pointedly noted the fact that the inventors had never been in the plaintiff's employ, 2006 WL 2850513, *1, and that the plaintiff did not even know where they resided. *Id.*, at *2. Under these circumstances, it could not be said that the plaintiff had "actual control" of the inventor. Here of course, Mr. Sakamoto's address is known, he is a former employee, and the contractual language the parties chose is a good deal more precise than that in *Litetronics International*.

In any event, I do not think that the absence of the word "testify" is dispositive of the question of whether the agreement in this case obligated Mr. Sakamoto to be deposed if Murata thought it "desirable." "It is part of wisdom, particularly for judges not to be victimized by words.". *Shapiro v. United States*, 335 U.S. 1, 56 (1948) (Frankfurter, J., dissenting). *Cf.* Holmes, *Law and Science and Science and Law*, 12 Harv.L.Rev. 443, 460 (1889)("We must think things, not words, or at least we must constantly translate our words into facts for which they stand, if we are to keep to the real and the true.").

Murata ignores the context in which the words are used and the breadth of the assignment's language. It focuses impermissibly on selected phrases. It argues that the paragraph lists the only types of proceedings and acts that Murata and Mr. Sakamoto had in mind. The proceedings, as Murata would have it, are limited to "divisions, continuations, continuations-in-part, reissues, extensions, and interferences," which are Patent Office proceedings. In addition, Murata submits

18

that the "acts" Mr. Sakamoto agreed to do were those specifically enumerated: "sign all papers" and "take all lawful oaths." As such, Murata maintains that the language does not cover a deposition in an infringement lawsuit.

But when interpreting a contract, the document is to be read as a whole, *Beanstalk Group, Inc. v. AM General Corp.*, 283 F.3d 856 (7th Cir. 2002), words should be given their ordinary meaning, *Bland v. Fiatallis North America, Inc.*, 401 F.3d 779, 784 (7th Cir. 2005); *Utility Audit, Inc. v. Horace Mann Service Corp.*, 383 F.3d 683, 687 (7th Cir. 2004), and terms should not be ignored. *Miniat v. Ed Miniat, Inc.*, 315 F.3d 712, 715 (7th Cir. 2002); *Grun v. Pneumo Abex Corp.*, 163 F.3d 411, 421-422 (7th Cir. 1998); *GNB Battery Technologies, Inc. v. Gould, Inc.*, 65 F.3d 615, 622 (7th Cir. 1995).[6] Here, Murata ignores the word "including" which precedes the short list of proceedings. The use of the word "including" means that the specific proceedings are merely illustrative, not exclusive; they are part of a larger group. *See P. C. Pfeiffer Co., Inc. v. Ford*, 444 U.S. 69, 77 (1979); *Capocy v. Kirtadze*, 183 F.3d 629, 634 (7th Cir. 1999); *Northern Trust Co. v. MS Securities Services, Inc.*, 2006 WL 695668, *6 (N.D.Ill. 2006). Thus, the phrase "any proceeding" means just that – it is not limited by the list of examples. "[A]ny proceeding in connection with [the '641 Patent] in any country" would include this litigation.

Similarly, "all acts" cannot be interpreted as merely a reiteration of the two acts – "sign all papers" and "take all oaths" – listed before it. If that was all it included, the phrase would be

---

[6] The assignment was between a Japanese corporation and a Japanese citizen and, presumably, executed in Japan. Nevertheless, neither party suggests that Japanese law applies to its interpretation. Because the parties have failed to address or even raise this issue, I am free to assume that the foreign law is the same as the law of the forum. *Karim v. Finch Shipping Co., Ltd.*, 265 F.3d 258, 272 (5th Cir. 2001); *United States v. Westinghouse Elec. Corp.*, 648 F.2d 642, 647 n. 1 (9th Cir.1981); *Nakamura Trading Co. v. Sankyo Corp.*, 2006 WL 1049608, *2 (N.D.Ill. 2006); *Inversiones Rafeg, S.A. v. Veniculum, Inc.*, 1987 WL 15767, *2 (N.D.Ill. 1987).

rendered unnecessary, and the laws of contract interpretation do not allow for such a result. *Miniat*, 315 F.3d at 715. Accordingly, "all acts" must include sitting for a deposition, if that is what is "necessary" to enforce or defend the '641 Patent.

That is the interpretation that Bel Fuse espouses, but from there, Bel Fuse leaps to the conclusion that Murata must produce Mr. Sakamoto in Chicago or elsewhere in the United States. But to reach that result, Bel Fuse takes much the same tack as Murata, picking and choosing among the phrases of the assignment. It combines the phrase "any proceeding in connection with [the '641 Patent] in any country" with Mr. Sakamoto's agreement to "take all lawful oaths, and do all acts necessary or required," and arrives at the conclusion that Mr. Sakamoto must come to Chicago, or another location in the United States, such as Hawaii.

As the assignment is drafted, it provides a qualification to Mr. Sakamoto "tak[ing] all lawful oaths and do[ing] all acts necessary": his being advised that there a proceeding is "lawful and desirable." As the document is written, that proceeding may be in any country, but that does not mean that Mr. Sakamoto must travel the world in his retirement. His agreement may cover his being deposed, but there is nothing to suggest he envisioned and agreed to being deposed around the globe. *Yaskawa*, 201 F.R.D. at 444 (language that inventors agreed to "testify in all legal proceedings" was not a "contract to be deposed in any particular place."); *Medpointe Healthcare*, 2007 WL 211202, *1. In *Medpointe Healthcare*, the inventor agreed to "make all rightful oaths and do everything necessary or desirable to aid said [corporation], their successors and assigns, to obtain and enforce proper protection for said invention in the United States, their territories and possessions, and all foreign countries." 2007 WL 211202, *1. While the language clearly envisioned patent enforcement proceedings around the world, the court found that it did not mean that the inventor, a German

20

citizen, agreed to an American-style deposition governed by American discovery laws. 2007 WL 211202, *2. He was, the court found, familiar with the practices in his home country. *Id.* So, too, with Mr. Sakamoto here. His agreement cannot be construed to compel him to sit for a deposition here in the United Sates.

## III.

## CONCLUSION

In the end, Murata has the contractual power to require Mr. Sakamoto to sit for a deposition, if it concludes that it is "desirable" that he do so. If it chooses not to do so, there may well be severe consequences under Rule 37 or evidentiary consequences at trial. These of course will be matters for Judge Gottschall. However, Murata does not have the contractual authority to require Mr. Sakamoto to leave Japan to be deposed. Murata must submit an appropriate declaration as to the efforts it has taken to secure Mr. Sakamoto's cooperation as reasonably as it can. None of the cases – nor the parties' submissions – deal with the situation where the assignor simply refuses the assignee's request, breaching the agreement.

But from a practical standpoint, such questions would seem to matter little. Bel Fuse could have raised the argument it raises now at any point in this litigation. Instead, it waited until March 1, 2006, just seven weeks before the discovery deadline *it* had requested. When I adopted Bel Fuse's deadline, I indicated that there would be no extension, given the fact that Bel Fuse had been contemplating Mr. Sakamoto's deposition for years – and that was before I was aware of the fact that Bel Fuse would be seeking to depose Mr. Sakamoto under theories it could have advanced early

on in this litigation.

It was naive for Bel Fuse to imagine that, by waiting, the victory it might obtain would be anything more than pyrrhic. Bel Fuse knew the motion had to be briefed and considered, and that it was just one in an endless queue. *Northern Border Pipeline Co. v. 64.111 Acres of Land in Will County, Illinois,* 344 F.3d 693, 695 (7th Cir. 2003); *Channell v. Citicorp Nat. Services, Inc.,* 89 F.3d 379, 386 -387 (7th Cir. 1996). If Bel Fuse is correct and there is a six-month wait for United States Consulate facilities, then it knew full well that a Japanese deposition was out of the question. As already noted, the only hope would have been for Mr. Sakamoto to appear in the United Sates, but he is not obligated to do so, and by all accounts, would be unwilling to do so, even at Murata's request. Even then, arrangements would not be instantaneous.

For the foregoing reasons, Bel Fuse's motion to compel [#283] is GRANTED in part, and DENIED in part.

ENTERED: _____

UNITED STATES MAGISTRATE JUDGE

DATE: 5/2/07